IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL RAKOWSKI,

    *Plaintiff*,

v.

BEST BUY STORES, L.P. *et al*,

    *Defendants*.

Civil No. ELH-20-1107

**MEMORANDUM OPINION**

In this employment dispute, plaintiff Michael Rakowski has sued his former employer, Best Buy Stores, L.P. ("Best Buy" or "Employer"), and his former manager at Best Buy, Derek Basignani. ECF 1 (the "Complaint"). In a single-count Complaint, Rakowski asserts "interference and retaliation" under the Family Medical Leave Act ("FMLA"), 42 U.S.C. § 12101 *et seq*. *See* ECF 1 at 10.

Defendants have moved to compel arbitration and to dismiss or stay this action pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, and Best Buy's Arbitration Policy. ECF 4. The motion is supported by a memorandum of law (ECF 4-1, collectively, the "Motion") and six exhibits. ECF 4-2 to ECF 4-7. Plaintiff opposes the Motion. ECF 7 (the "Opposition"). Defendants have replied (ECF 10, the "Reply") and submitted seven additional exhibits. ECF 10-1 to ECF 10-7.

No hearing is necessary to resolve the Motion. Local Rule 105.6. For the reasons that follow, I shall grant the Motion and dismiss the suit.

## I.   Factual Background

### A.  Rakowski's Employment with Best Buy

Best Buy, a consumer electronics retailer, operates stores at locations throughout Maryland, including White Marsh.  ECF 1, ¶ 2.  Basignani served as "General Manager" of the White Marsh store in 2018.  *Id.* ¶ 3.

Rakowski began working for Best Buy at the White Marsh location in 2010.  *Id.* ¶ 6.  He started as a "Sales Consultant" in January 2010, was promoted to supervisor in October 2010, and became "Assistant Store Manager for Sales" in 2014.  *Id.*  Occasionally, Rakowski would also serve as "Manager-on-Duty and was responsible for the operations of the entire store."  *Id.* ¶ 8. He continued to serve as Assistant Store Manager until his final day of employment with Best Buy on June 2, 2018.  *Id.* ¶ 42.

According to plaintiff, he "maintained a highly successful professional career at Best Buy for more than eight years, managing overall operations and employees within the selling departments in his store."  *Id.* ¶ 7.  Plaintiff also alleges that he was "highly respected by his coworkers;" "won several awards;" "was chosen to represent Best Buy in the Community Grants Program;" and "he was ranked as one of the top assistant store managers within Best Buy during several months in 2017."  *Id.* ¶¶ 9,10.  Further, plaintiff was "selected to participate in the General Manager training classes during 2017," and claims that "he was told that he would be considered for a promotion during the next year."  *Id.* ¶ 10.  And, on January 20, 2018, Rakowski "received a plaque for Leadership Development" after he completed the general manager training.  *Id.* ¶ 13.

In November 2017, Rakowski's wife was diagnosed with breast cancer, for which she "would be undergoing surgery and chemotherapy and radiation treatment . . . ."  *Id.* ¶¶ 11, 12. According to plaintiff, his wife "would need assistance with daily tasks such as preparing meals,

getting dressed, going to the bathroom, being transported to and from doctor's appointments and medical procedures and other daily tasks." *Id.*

Rakowski's wife underwent a lumpectomy on January 30, 2018. *Id.* ¶ 14. Then, on February 4, 2018, Rakowski "asked his coworker, Sharon McCargo-Garrison," the "Assistant Store Manager for Operations, if she would switch shifts with him" on February 15, 2018, because he was scheduled to work on that date, and his wife had a chemotherapy appointment. *Id.* According to plaintiff, "he had previously requested to be off on that date, but Mr. Basignani scheduled him to work." *Id.* And, according to plaintiff, McCargo-Garrison "immediately refused" Rakowski's request to switch shifts. *Id.* ¶ 15. Thereafter, Rakowski "complained to Stacy Wilson," a human resources manager, who "told him that he should apply for FMLA coverage to protect himself." *Id.*

On February 9, 2018, Rakowski "formally notified Best Buy that he would need time off to care for his wife." *Id.* ¶ 16. He submitted an application for "intermittent FMLA leave" on February 21, 2018, so that he could assist his wife "while she underwent medical treatment for her breast cancer." *Id.*

A week later, on February 28, 2018, Best Buy approved Rakowski's application for intermittent FMLA leave coverage for the period from March 9, 2018 through July 13, 2018, which was the "initial estimated period of time" that Rakowski's wife would be undergoing procedures and treatment. *Id.* ¶¶ 17, 18. In doing so, Best Buy "agreed to modify [plaintiff's] normal weekly schedule" for the requested time period. *Id.* This meant "that instead of working five or six days each week, totaling between fifty (50) and sixty (60) hours each week," Rakowski "would be allowed to work four days a week for up to six hours each day for a total of approximately twenty-four (24) hours each week." *Id.* ¶ 17. Rakowski would also "be allowed to take a full day off on

3

up to four days each month if necessary to provide care to his wife" for the period from February 10, 2018 to February 9, 2019.  *Id.* ¶ 19.

The week of March 9, 2018, immediately after Rakowski's FMLA request was approved, he "was allowed to work a limited schedule since it was the first week of his wife's chemotherapy treatment." *Id.* ¶ 20.  However, according to plaintiff, the next week, Basignani required Rakowski "to continue working the same long hours that he had" worked before requesting FMLA leave.  *Id.* ¶¶ 20-21.  In particular, Rakowski worked "a) from 11:00 a.m. to close on Sunday; b) from 7 a.m. to 5 p.m. on Monday; c) from 12 p.m. to close on Tuesday; d) from 12 p.m. to close on Thursday; and e) from 7 a.m. to 5 p.m. on Saturday." *Id.* ¶ 21.[1]  This totaled more than 50 hours during that week, even though plaintiff was only supposed to work 24 hours per week.  *Id.* ¶ 22.  Moreover, Rakowski claims that he was consistently required to work more than 50 hours a week throughout the remainder of his employment with Best Buy, including the week of April 15, 2018, and his last two weeks of work.  *Id.* ¶¶ 27-29, 39-40.

Rakowski alleges that he "complained about his scheduled hours" to Basignani and Wilson.  *Id.* ¶ 23.  But, Basignani "refused to change" Rakowski's schedule, and Wilson told Rakowski "that he had to handle the matter with Mr. Basignani."  *Id.*; *see also id.* ¶ 30.

On March 23, 2018, Rakowski asked Basignani if "he could move up his previously scheduled vacation (in July 2018) to the time frame between March 27, 2018 and April 14, 2018," to give him additional time to care for his wife.  *Id.* ¶ 24.  According to Rakowski, "Basignani assured him that it was fine" to change the time of his vacation.  *Id.*  As a result, Rakowski did not go into work between March 27, 2018 and April 14, 2018.  *Id.* ¶ 25. However, during this period

---

[1] The store closing times are not specified.

Rakowski alleges that he "was repeatedly contacted by management at Best Buy to answer questions and deal with store issues." *Id.* ¶ 26.

Moreover, Rakowski claims that on April 19, 2018, he "learned that Mr. Basignani had not changed his schedule to allow him to use his previously-scheduled vacation time." *Id.* ¶ 31. Instead, Basignani "improperly submitted the time off as 'continuous FMLA leave' time," even though Rakowski had never applied for continuous FMLA leave and had not "authorized" Basignani to file such a request on his behalf. *Id.*

On April 25, 2018, the human resources department contacted Rakowski to inform him that he was required to submit "documentation to support his time off by April 26, 2018" or "his absences would be considered unexcused, which would subject him to potential disciplinary action, up to and including termination." *Id.* ¶ 32. According to plaintiff, "[t]his was part of a continuing stream of harassment and mistreatment that [he] was subjected to for attempting to exercise his rights under the FMLA." *Id.* ¶ 33.

Further, Rakowski alleges that "during this time frame" some of his "coworkers made inappropriate and condescending comments" regarding Rakowski's "need for leave to take care of his wife." *Id.* ¶ 34. McCargo-Garrison, for example, called Rakowski "'a joke' when he was discussing his need for time off," and Anthony Rosselli, a sales manager, "joked about Mr. Rakowski's need for time off to care for his wife." *Id.* In addition, neither Basignani nor McCargo-Garrison signed the "get well card" that all of the other staff at the store gave to Rakowski for his wife. *Id.* ¶ 35. Plaintiff maintains that, "[t]aken as a whole, Mr. Basignani's and Ms. McCargo-Garrison's hostility towards Mr. Rakowski was evident." *Id.*

On May 15, 2018, Rakowski told Basignani that "his schedule for the next week was, once again, not compliant with his FMLA leave." *Id.* ¶ 36. According to plaintiff, in response,

Basignani said that "'the plan' was not for him to have reduced hours and that he was negatively 'impacting other people's households' by requesting a reduced schedule." *Id.* Basignani also allegedly "suggested that he did not think that Mr. Rakowski needed time off and wanted to know exactly what Mr. Rakowski would be doing for his wife if he stayed home instead of coming to work." *Id.*

Later that same day, Rakowski resigned from his position, effective June 2, 2018. *Id.* ¶ 38. Rakowski alleges that he "believed he had no choice but to resign from his position…because Best Buy was not allowing him time to provide care for his wife." *Id.* In fact, the day after he resigned, plaintiff claims that Basignani told him "not to return to the store for his final two weeks, stating, 'Well isn't this what you wanted, now you can spend time with your wife.'" *Id.* ¶ 41.

Rakowski alleges that, as a result of Best Buy's "decision to interfere with and retaliate against" him, he was subjected to "constructive discharge," and he "suffered lost wages and benefits, as well as emotional distress, including extreme embarrassment and humiliation, anxiety, stress and tension headaches, loss of appetite, depression, diminished self-esteem, and loss of sleep." *Id.* ¶ 43.[2] Further, Rakowski's wife's car was repossessed by the lender and he and his wife were evicted from their home. *Id.* And, he was "forced to drain his retirement account and incurred medical bills and various other costs that he would not have incurred but for his constructive discharge from Best Buy." *Id.* ¶ 44.

On October 1, 2018, Rakowski was awarded unemployment benefits from the Maryland Department of Labor, Licensing and Regulation ("DLLR"). *Id.* ¶ 45. According to plaintiff, the DLLR found that Rakowski "had good cause to quit his job when he was granted family medical

---

[2] Plaintiff does not assert a claim for constructive discharge. The reference to "constructive discharge" appears only once in the suit, as indicated.

leave, but the Employer continued to schedule him for the same full-time work hours as if he had not been provided with FMLA. In connection therewith, the Employer also threatened the Claimant for not being able to work the same work hours that he had been excused from working." *Id.* And, DLLR allegedly concluded that Rakowski "has demonstrated that the reason that he quit his job was caused by the actions of the Employer and his reasons were of such a necessitous and compelling nature that he had no reasonable alternative other than to sever his employment." *Id.* ¶ 46.

### B.  The Arbitration Policy

According to defendants, Best Buy "has a mutually binding arbitration policy" that has been "applicable to all of its employees, including Rakowski, beginning or continuing employment after March 15, 2016." ECF 4-2 (Declaration of Sarah McPherson, Best Buy Senior Manager), ¶ 3; *see* ECF 4-3 (the "Arbitration Policy" or the "Policy").

The Arbitration Policy states, in relevant part, ECF 4-3 at 1 (emphasis in original):

This Policy is a binding contract between Best Buy and Best Buy's employment applicants and Employees….

This Policy requires that employment applicants and Employees bring in arbitration, rather than in court, any past, present or future claims, disputes, or lawsuits of any kind ("Claims") that they may have against Best Buy, on an individual basis only…. For Employees, this Policy is a mandatory condition of initial and continuing employment at Best Buy, and applies even after employment ends. **By becoming or remaining employed after the effective date of this Policy, employees agree to this Policy's terms**….

**All disputes covered by this Arbitration Policy will be decided by an arbitrator in arbitration and not by way of a court or jury trial.**

The Arbitration Policy expressly provides that claims covered by the Policy include "[c]laims under any federal statute . . .", including the FMLA. *Id.* at 3.

Defendants explain that "Best Buy uses various tools, including E-Learnings, to ensure that its employees know and understand the effect of its employment policies and procedures." ECF 4-2, ¶ 5. Employees are required to log on to Best Buy's online "Learning Network" to see the E-Learnings that need to be completed. *Id.* Employees learn about this requirement during "their initial employment orientation and thereafter through periodic reminders from the store's General Managers and their supervisors." *Id.*

According to defendants, all Best Buy employees were notified "of the implementation of the Arbitration Policy." *Id.* ¶ 6. Notice of the Arbitration Policy and the required E-Learning program about the Policy was first posted to the Learning Network on February 3, 2016. *Id.* And, the "notice" apparently "remained visible on the Learning Network, and was highlighted in red, until [the relevant E-Learning program was] completed by the employee." *Id.*

Best Buy also maintains an "Employee Hub" that employees are required to access "on a regular basis for communications and other information relating to their employment." *Id.* ¶ 7. A notice about the Arbitration Policy and the required E-learning was sent through the Employee Hub on "February 3, February 4, February 5, February 11, February 19, February 22, and February 29, 2016." *Id.*; *see* ECF 4-4 (Employee Hub notices).

The E-Learning program explained the "key components" of the Policy; that the Policy is mandatory; and that it is binding on "Best Buy and all Best Buy employees who continue their employment." ECF 4-2, ¶ 8; *see* ECF 4-5 (E-Learning Program Slides). The E-Learning program also included a link to a separate pdf with frequently asked questions ("FAQs") about the Arbitration Policy. *See* ECF 4-6 (Policy FAQs). The FAQs explain that the Arbitration Policy "covers all claims related to your employment with certain very limited exceptions." *Id.* at 1. And, in response to the question, "What if I do not agree to the terms of the Arbitration Policy?," the

8

FAQs state: "As with any other Best Buy policy, by remaining employed, employees are considered to have agreed to the policy. The purpose of the eLearning is to ensure employees read and understand the policy." *Id.* at 1.

After the employee "has reviewed the E-Learning arbitration program, the employee electronically acknowledges" that he or she has reviewed it. ECF 4-2, ¶ 10. The acknowledgement provides, ECF 4-5 at 5:

> As with any other Best Buy policy, by remaining employed, you are considered to have agreed to the policy. The purpose of the eLearning is to ensure you read and understand the policy. Employees who do not take this eLearning are still subject to the policy.
>
> I have read and understand the Best Buy Arbitration Policy that takes effect on March 15, 2016.

Rakowski's E-Learning Record reflects that on July 27, 2016, he completed and acknowledged the E-Learning program with respect to the Arbitration Policy. ECF 4-2, ¶ 12; ECF 4-7 (Rakowski's E-Learning Record).

## II.  Legal Standards

### A. The Federal Arbitration Act

As noted, defendants move to compel arbitration and to dismiss or stay this action pursuant to the FAA, 9 U.S.C. § 1 *et seq.*

"Arbitration is a matter of contract." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 286 (4th Cir. 2020).  The FAA, which was enacted in 1925, "requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, ___ U.S. ___, 139 S. Ct. 1407, 1412 (2019); *see Mey*, 971 F.3d at 286; *see also McCormick v. Am. Online, Inc.*, 909 F.3d 677, 679 (4th Cir. 2018) (stating that the FAA "provides for the enforceability of arbitration agreements and specifies procedures for conducting arbitrations and enforcing arbitration awards").  Under

§ 2 of the FAA, an arbitration contract is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Thus, the FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, ___ U.S. ___, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also McCormick*, 909 F.3d at 680 ("[T]he FAA elevates the arbitration of claims as a favored alternative to litigation when the parties agree in writing to arbitration.").

Indeed, the FAA "places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). Therefore, they are enforced according to their terms. *Mey*, 2020 WL 4660194, at *2.

As noted, defendants move to compel arbitration. In *Adkins v. Labor Ready, Inc.*, 303 F.3d 496 (4th Cir. 2002), the Fourth Circuit explained, *id.* at 500-01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)):

> In the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."

The *Adkins* Court also said, 303 F.3d at 500: "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." Accordingly, a court must "engage in a limited review to ensure that the dispute is arbitrable—*i.e.*, that a valid agreement exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Murray v. United Food and Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002).

Section 3 of the FAA is also relevant. It provides, 9 U.S.C. § 3:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Thus, the Fourth Circuit has said: "The FAA requires a court to stay 'any suit or proceeding' pending arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.' This stay-of-litigation provision is mandatory." *Adkins*, 303 F.3d at 500 (quoting 9 U.S.C. § 3)). Nevertheless, in lieu of a stay, some courts have determined that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001); *see Willcock v. My Goodness! Games, Inc.*, PWG-16-4020, 2018 WL 3970474, at *4 (D. Md. Aug. 20, 2018); *Kabba v. Ctr.*, PWG-17-211, 2017 WL 1508829, at *2 (D. Md. Apr. 27, 2017) (same), *aff'd*, 730 F. App'x 141 (4th Cir. 2018).

Under 9 U.S.C. § 4, a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition a district court "for an order directing that such arbitration proceed in the manner provided for in such agreement." Section 4 further provides that, when presented with such a petition, a court

shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

Conversely, § 4 provides that if the "making of the arbitration agreement . . . be in issue," then "the court shall proceed summarily to the trial thereof." *Id.* Thus, § 4 requires the district court, not an arbitrator, to "decide whether the parties have formed an agreement to arbitrate." *Berkeley Co. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019); *see Granite Rock Co.*

11

*v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 296 (2010) (explaining that dispute over formation of agreement to arbitrate "is generally for court[] to decide"); *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 637 (4th Cir. 2002).[3]

"Whether a party has agreed to arbitrate an issue is a matter of contract interpretation:  '[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  *Levin v. Alms and Assoc., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (alteration in *Levin*) (quoting *Am. Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 92 (4th Cir. 1996) (citation omitted)) (alteration in *Levin*); *see Berkeley*, 944 F.3d at 236; *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 913 F.3d 409, 415 (4th Cir. 2019). That said, the "FAA's policy of favoring arbitration augments 'ordinary rules of contract interpretation,' and requires all ambiguities to be resolved in favor of arbitration." *Ashford v. Pricewaterhouse Coopers LLP*, 954 F.3d 678, 682-83 (4th Cir. 2020) (quoting *Choice Hotels Int'l*, 252 F.3d at 710); *see Levin*, 634 F.3d at 266 ("The 'heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'"); *see also Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013).

## B.  Rule 12(b)(3)

The Supreme Court has observed that an arbitration clause is "a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."  *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974).   In *Sucampo Pharmaceuticals, Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006), the Fourth

---

[3] The Supreme Court has said "that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, ___ U.S. ___, 139 S. Ct. 524, 529 (2019) (internal quotation marks omitted).

Circuit determined that "a motion to dismiss based on a forum-selection clause," such as an arbitration provision, "should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue."  The *Sucampo* Court explained, *id* at 548 (internal and external citations omitted) (my alteration):

> [T]reating a motion to dismiss on the basis of a forum-selection clause under Rule 12(b)(1) presents practical difficulties that undercut the benefits gained from enforcement of the clauses.  For example, the court must raise the issue of subject-matter jurisdiction *sua sponte*, if necessary.  *See* Fed. R. Civ. P. 12(h)(3).  Thus, in cases involving forum-selection clauses, both district and circuit courts would be under an obligation to confirm that the clause was not applicable before reaching the merits of the action. . . .  More importantly a motion to dismiss under Rule 12(b)(1) is non-waivable and may be brought at any time—even on appeal—regardless of whether a litigant raised the issue in an initial pleading.  Litigants, therefore, could hold back forum-selection clause objections, until after discovery—or even an adverse verdict.

Moreover, the Fourth Circuit has recognized that Rule 12(b)(6) "is not the appropriate motion for enforcing a forum-selection clause."  *Sucampo*, 471 F.3d at 549.  It explained that "because a 12(b)(6) motion may be brought at any time prior to adjudication on the merits, analyzing forum-selection clauses under Rule 12(b)(6) would present some of the same timing concerns as in the 12(b)(1) context."  *Id.* (citations omitted).  The Court reasoned: "Analyzing forum-selection agreements under Rule 12(b)(3) would avoid the doctrinal and timing disadvantages of utilizing Rule 12(b)(1) or (6) and be consistent with Supreme Court precedent." *Id.* (citing *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998) (finding that motions to dismiss based on forum-selection clause should be analyzed under Rule 12(b)(3) based on the Supreme Court's decision in *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)).

Since *Sucampo*, the Fourth Circuit has reiterated that a challenge based on a forum-selection clause, including an arbitration clause, should be addressed by way of a motion to dismiss for improper venue under Rule 12(b)(3).  *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d

355, 365 n.9 (4th Cir. 2012).  Nevertheless, other judges of this court have considered motions to

dismiss in favor of arbitration under Rule 12(b)(1) and Rule 12(b)(6).  *See, e.g., Willcock*, 2018

WL 3970474, *3 (D. Md. Aug. 20, 2018) (collecting cases); *Garrett v. Monterey Fin. Servs., LLC*,

JKB-18-325, 2018 WL 3579856, at *2 (D. Md. July 25, 2018) ("[M]otions to dismiss in connection

with a valid arbitration agreement are often brought under Rule 12(b)(6) based on the observation

that the existence of a valid arbitration clause does not technically deprive the Court of subject

matter jurisdiction. . . . However, courts have also found it proper to dismiss claims subject to

arbitration agreements under Rule 12(b)(1)." (citations omitted)); *Lomax v. Weinstock, Friedman

& Friedman, P.A.*, CCB-13-1442, 2014 WL 176779, at *2 (D. Md. Jan. 15, 2014) ("Courts have

found it proper to dismiss claims subject to arbitration agreements under both Rule 12(b)(1) and

Rule 12(b)(6)."), *aff'd*, 583 F. App'x 100 (4th Cir. 2014).

In light of the Fourth Circuit's guidance in *Sucampo*, I shall construe defendant's motion

to dismiss as one brought under Rule 12(b)(3).  *See, e.g., Am. Ins. Mktg. Corp. v. 5 Star Life Ins.

Co.*, DKC-13-0560, 958 F. Supp. 2d 609, 612 (D. Md. 2013) (considering a motion to dismiss

based on a forum selection clause pursuant to Rule 12(b)(3)); *Enter. Info. Mgmt., Inc. v.

SuperLetter.com, Inc.*, DKC-13-2131, 2013 WL 5964563, at *3 (D. Md. Nov. 7, 2013)

(considering a motion to dismiss in favor of arbitration pursuant to Rule 12(b)(3)).

In the Fourth Circuit, when a challenge to venue is raised under Rule 12(b)(3), the plaintiff

bears the burden of demonstrating that venue is appropriate.  *Bartholomew v. Va. Chiropractors

Ass'n,* 612 F.2d 812, 816 (4th Cir. 1979), *cert. denied*, 446 U.S. 938 (1980), *overruled on other

grounds by Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982); *accord Tinoco v. Thesis

Painting, Inc.*, GJH-16-752, 2017 WL 52554, at *2 (D. Md. Jan. 3, 2017); *Jones v. Koons Auto.

Inc.,* 752 F. Supp. 2d 670, 679 (D. Md. 2010).  If the court does not hold an evidentiary hearing,

"the plaintiff need only make a prima facie showing that venue is proper." *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 732 (D. Md. 2017) (citing *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)).  "In assessing whether there has been a prima facie venue showing, [the court views] the facts in the light most favorable to the plaintiff." *Aggarao*, 675 F.3d at 366.  And, the court may "freely consider evidence outside the pleadings . . . ." *Sucampo*, 471 F.3d at 550; *see also Aggarao*, 675 F.3d at 365-56 ("On a motion to dismiss under Rule 12(b)(3), a court is permitted to consider evidence outside the pleadings."); *Taylor v. Shreeji Swami, Inc.*, PWG-16-3787, *2017 WL 1832206*, at *1 (D. Md. May 8, 2017) (same); *Convergence Mgmt. Assocs., Inc. v. Callender*, TDC-15-4015, 2016 WL 6662253, at *2 (D. Md. Nov. 10, 2016) (same).

Because "'it is possible for venue to be proper in more than one judicial district,' the question is not whether a given district is the best venue, but whether the events or omissions that occurred there are 'sufficiently substantial.'" *Carefirst*, 235 F. Supp. 3d at 732 (quoting *Mitrano*, 377 F.3d at 405).  And, in considering "whether events or omissions are sufficiently substantial to support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Mirtano*, 377 F.3d at 406 (citation omitted).  Instead, "it should review 'the entire sequence of events underlying the claim.'" *Id.*; *accord Taylor*, 2017 WL 1832206, at *1; *Callender*, 2016 WL 6662253, at *2.

As indicated, a motion to dismiss for improper venue, filed under Rule 12(b)(3), "allows the court to freely consider evidence outside the pleadings . . . ." *Sucampo*, 471 F.3d at 550. Accordingly, the Court considers the exhibits submitted by defendants with their Motion and their Reply.  ECF 4-2 to ECF 4-7; ECF 10-1 to ECF 10-7.

### C.  Choice of Law

Absent a choice-of-law provision, Maryland law recognizes the principle of *lex loci contractus* for contract claims.  *See Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015).  Under that doctrine, a court must apply the substantive law of the state where the contract was formed.  *See id.*; *see also Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 925 A.2d 636, 648-49 (2007); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995).

Both sides agree that the contract arising from the Arbitration Policy was formulated in Maryland, and that Maryland law applies as to the question of whether Best Buy's Policy is binding on plaintiff.  ECF 4-1 at 7; ECF 7 at 3.  Therefore, I shall apply Maryland law to determine the enforceability of the Arbitration Policy.

### III. Discussion

Defendants have moved to enforce arbitration and dismiss this matter, arguing that a valid and enforceable arbitration agreement exists between Rakowski and Best Buy.  ECF 4-1 at 7-10. They contend that Rakowski expressly agreed to be bound by the Arbitration Policy because he signed the acknowledgement page on the relevant E-Learning module. ECF 4-1 at 8; ECF 10 at 2. Further, they argue that Rakowski's continued performance as an employee constituted acceptance of the Policy.  *Id.*

Rakowski does not argue that the Arbitration Policy is unconscionable or otherwise unenforceable.  *See* ECF 7.  Nor does he argue that the Policy, even if valid, does not encompass the claims in his Complaint.  *See id.*  Rather, Rakowski contends that the Arbitration Policy is unenforceable because he "never expressly consented or agreed" to it.  ECF 7 at 1-7.

Plaintiff posits that the acknowledgment "only stated that he acknowledged that he read and understood" the Policy, "not that he agreed or consented to" it. *Id.* at 4. Moreover, plaintiff avers that "continued employment is not sufficient to demonstrate agreement to binding arbitration" under Maryland law because a court is "required to look at the 'making of the agreement to arbitrate' and not any circumstances thereafter." *Id.* (quoting *Cheeks v. United Healthcare of the Mid-Atlantic, Inc.*, 378 Md. 139, 153-55, 835 A.2d 656, 665 (2003)). Thus, the only issue before the Court is whether the parties are subject to a valid and enforceable agreement to arbitrate.

## A. Enforceability

An agreement to arbitrate is "'a matter of contract,'" and therefore "'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). To decide whether the parties agreed to arbitration "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 607 (4th Cir. 2013); *Farmer v. Macy's Inc.*, TDC-17-0567, 2019 WL 5079763, at *3 (D. Md. Oct. 10, 2019).

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990); *accord* RESTATEMENT (SECOND) CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v.*

17

*Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)).  Thus, mutual assent is an integral component of every contract.  *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ."  *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)).  "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms."  *Cochran*, 398 Md. at 14, 919 A.2d at 708.  "Importantly, acceptance may be manifested by actions as well as words." *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 87 (4th Cir. 2016) (citing *Porter v. General Boiler Casing Co.*, 284 Md. 402, 396 A.2d 1090, 1095 (1979) ("The purpose of a signature is to demonstrate 'mutuality or assent' which could as well be shown by the conduct of the parties.")).

Plaintiff relies on *Dugan v. BestBuy Co.*, No. A-1897-16T4, 2017 WL 3442807 (N.J. Super. Ct. App. Div. Aug. 11, 2017), to support his contention that the Arbitration Policy is not enforceable because he never expressly consented to it.  The *Dugan* Court, which also considered

18

a motion to compel arbitration under the Best Buy Arbitration Policy, concluded that the employee's signature on the acknowledgement page did not constitute the employee's agreement to be bound by the Policy. *Id.* at *3-4. Moreover, the court found that the employee's continued employment was not sufficient to show agreement or consent to the Policy. *Id.* at *4.

However, plaintiff omits reference to a key component of the *Dugan* Court's analysis. The court reasoned that the plaintiff's employment with Best Buy after the Policy became effective was for such a "brief period"—only three weeks—that his continued employment was not sufficient to indicate his consent to the Policy. *Id.* In doing so, the court distinguished Dugan's case from *Jaworski v. Ernst & Young U.S. LLP*, 441 N.J. Super 464, 119 A.3d 939 (App. Div. 2015), which concluded that a plaintiff's continued employment for five years after the effective date of an arbitration policy reflected plaintiff's consent to the policy. *Dugan*, 2017 WL 3442807, at *4. The *Dugan* Court reasoned: "While remaining employed for five years may reflect an employee's acquiescence to employment terms, plaintiff's continuation of employment for three weeks was not an explicit, unmistakable acceptance of the policy." *Id.* In contrast to the plaintiff in *Dugan*, Rakowski continued working for Best Buy for over two years after the Arbitration Policy went into effect. Therefore, plaintiff's reliance on *Dugan* is misplaced. Indeed, the *Dugan* Court's analysis supports defendants' position.

Even if plaintiff's online acknowledgement does not constitute a manifestation of assent to the Arbitration Policy, his continued employment is sufficient to demonstrate his consent and render the Policy enforceable. Under Maryland law, employer policy directives may "become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer." *Dahl v. Brunswick*, 277 Md. 471, 476, 356 A.2d 221, 224 (1976) (employee evidenced acceptance of company's severance policy by his continued employment);

*Staggs v. Blue Cross of Maryland, Inc.*, 61 Md. App. 381, 391-2, 486 A.2d 798, 803 (1985) (holding provisions in employment policy statements may "become contractual undertakings" if properly expressed and communicated to employee).

Further, "[i]t is generally recognized that continued employment can constitute acceptance of a contract," including an agreement to arbitrate, "when such employment is conditioned on acceptance of the contract." *Gordon v. TBC Retail Group, Inc.*, 2016 WL 4247738, at *10 (D. S.C. Aug. 11, 2016) (citing *Towles v. United HealthCare Corp.*, 524 S.E.2d 839, 845 (S.C. Ct. App. 1999); *Czopek v. TBC Retail Grp., Inc.*, No. 8:14-cv-675-T-36TBM, 2014 WL 5782794, at *4 (M.D. Fla. Nov. 6, 2014); *Caley v. Gulfstream Aerospace Corp.*, 333 F. Supp. 2d 1367, 1375 (N.D. Ga. 2004), *aff'd*, 428 F.3d 1359 (11th Cir. 2005) ("As a matter of law, then, Defendants' offer was open to acceptance through Plaintiffs' continuation of employment.")); *see also, e.g.*, *Hightower v. GMRI, Inc.*, 272 F.3d 239 (4th Cir. 2001); *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972-73 (6th Cir. 2007) (finding that employee agreed to arbitrate employment dispute by continuing employment after effective date of alternative dispute resolution program because continued employment constituted employee's acceptance of agreement to arbitrate). *See also Bey v. Midland Credit Mgmt., Inc.*, GJH-15-1329, 2016 WL 1226648 (D. Md. March 23, 2016) (finding plaintiff was bound by arbitration agreement even if he did not sign it because it provided that agreement would bind plaintiff upon his use of the service); *Bentaous v. Asset Acceptance, LLC*, JFM-13-3314, 2014 WL 5790946, at *2 (D. Md. Nov. 4, 2014) ("[Plaintiff] accepted the terms and conditions [including the arbitration agreement therein] by keeping the Computer equipment she initially purchased and by using the account to purchase additional computer equipment over the years.").

In *Hightower*, 272 F.3d 239, the Fourth Circuit enforced an arbitration requirement based on a similar set of facts.  There, the employee attended a meeting where the arbitration policy was introduced and signed an attendance sheet acknowledging receipt of materials about the new policy.  *Id.* at 242-43.  The materials made it clear that the dispute resolution program was the exclusive method for resolving employment disputes.  *Id.*  The Court concluded that, because the employee was made aware of the policy through the meeting and distributed materials, his continued employment with the company indicated that he "knew of and assented to the" arbitration policy.  *Id.*

Like the employee in *Hightower*, Rakowski was notified that Best Buy was instituting a new Arbitration Policy.  Prior to implementation of the Policy on March 15, 2016, Best Buy posted the Arbitration Policy and the E-Learning module about the Policy to Best Buy's intranet site, the "Learning Network."  ECF 4-2, ¶¶ 5-8.  On multiple occasions in February 2016, Best Buy sent notice of the Policy and the required training module on the Policy through its "Employee Hub." *Id.* ¶ 7.  Further, on July 27, 2016, plaintiff reviewed the materials and acknowledged his review and understanding of the Policy.  ECF 4-7.

In addition, both the Arbitration Policy and the E-Learning program specifically stated that, "by remaining employed, you are considered to have agreed to the policy."  ECF 4-5 at 4; ECF 4-3 at 1.  Rakowski continued working for Best Buy for over two years beyond the effective date of the Policy, without raising any objection to it.  Rakowski was clearly aware of the Policy and the manner of acceptance—continued employment.  As a result, based on his continued employment, his conduct constituted his agreement to be bound by the Policy.  *See Hightower*, 272 F.3d at 242-44; *Seawright*, 507 F.3d at 972-73.

21

And, it is irrelevant whether there is any "actual [written] evidence demonstrating" Rakowski's consent to be bound by the agreement.  ECF 7 at 9.  *See International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000) ("While a contract cannot bind parties to arbitrate disputes they have not agreed to arbitrate, it does not follow that under the Federal Arbitration Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision. Rather, a party can agree to submit to arbitration by means other then personally signing a contract containing an arbitration clause." (internal citations omitted)).

Other courts facing similar disputes, including those related to Best Buy's Arbitration Policy, have reached the same result.  In *Lovig v. Best Buy stores L.P., et al.*, No. 18-cv-02807-PJH, 2018 U.S. Dist. LEXIS 146473 (N.D. Cal., Aug. 28, 2018), which also involved a dispute over whether the employee assented to Best Buy's Arbitration Policy, the court found that there was an enforceable arbitration agreement between the employee and Best Buy even though the employee never completed the E-Learning program on the Arbitration Policy or signed the acknowledgement. *Id.* at *14-15.  The court held that the fact that the employee was put on notice of the Policy, the Policy specifically stated that continued employment constituted agreement to its terms, and plaintiff continued to work for Best Buy for five months after the Policy went into effect indicated the employee's consent to be bound by the Arbitration Policy even if he did not know that his actions would constitute acceptance.  *Id.*; *see also Stephens v. Frisch's Big Boy Restaurants*, No. 1:19-cv-954, 2020 WL 4754682, at *3 (S.D. Ohio July 30, 2020) (finding plaintiff's continued employment with employer was sufficient evidence of her assent to arbitration agreement even if court accepted that plaintiff did not acknowledge the arbitration agreement); *Mitchell v. Cambridge Franchise Holdings, LLC*, 433 F. Supp. 3d 1064, 1071 (W.D.

Ky. 2020) (arbitration agreement was a condition of continued employment and plaintiff received notification of the policy, so plaintiff indicated that she consented to the agreement's terms by continuing to go to work).  In addition to all the factors that constituted an agreement in *Lovig*, Rakowski also completed the E-Learning module, signed the acknowledgment page, and continued working for Best Buy for another two years.

Accordingly, I conclude that Rakowski and Best Buy entered into a valid and enforceable arbitration agreement.

### C. The Remedy

There is "tension" within the Fourth Circuit regarding whether dismissal or a stay is appropriate when granting a motion to compel arbitration.  *Aggaro v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 376 (4th Cir. 2012).  Ordinarily, the "'proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings pending arbitration,'" under Section 3 of the FAA, "'rather than to dismiss outright.'"  *Id.* at 376 n.18 (citation omitted).  However, Fourth Circuit case law indicates that dismissal, rather than a stay, may be "a proper remedy when *all* of the issues presented in a lawsuit are arbitrable."  *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) (emphasis added); *see also Aggaro*, 675 F.3d at 376 n.18 (discussing *Choice Hotels* and status of circuit split as to "whether a district court has discretion to dismiss rather than stay an action subject to arbitration").

As Judge Chasnow noted in *Taylor v. Santander Consumer USA, Inc.*, DKC-15-0442, 2015 WL 5178018, at *7 (D. Md. Sept 3, 2015), despite the "disagreement within the Fourth Circuit as to [whether] dismissal is appropriate, . . . district courts within the Fourth Circuit have continued to find dismissal appropriate."  *See, e.g.*, *Willcock*, 2018 WL 3970474, at *5; *Garrett*, 2018 WL 3579856, at *4 ("The FAA requires a district court to stay judicial proceedings involving issues

covered by arbitration agreements.  Dismissal is also a proper remedy under the circumstances."
(citation omitted)); *Bracey v. Lancaster Foods, LLC*, RDB-17-1826, 2018 WL 1570239, at *7 (D.
Md. Mar. 30, 2018) ("Having determined that Bracey is bound by the Arbitration claims.")  (citing
*Choice Hotels*)); *Washington v. Lennar Corp.*, TDC-17-0079, 2018 WL 722418, at *3 (D. Md.
Feb. 5, 2018) ("While the FAA further requires only that this Court stay the proceedings pending
that arbitration, 'dismissal is prober when all of the issues presented in a lawsuit are arbitrable.'
*Choice Hotels* . . . .  Here, all of Washington's claims against Lennar are within the scope of the
parties' arbitration clause.  The Court will thus dismiss Washington's claims.").

The Complaint's only count falls within the scope of the Arbitration Policy.  Accordingly,
I shall dismiss plaintiff's suit.

## IV. Conclusion

For the reasons set forth above, I shall grant the Motion (ECF 4) and dismiss the case.

An Order follows.

Date: November 3, 2020                                   /s/
                                          Ellen L. Hollander
                                          United States District Judge